**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **CANTIUM, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 23-78** |
| **FDF ENERGY SERVICES, LLC** | **SECTION "L" (2)** |

## ORDER & REASONS

This Order was originally issued on April 2, 2024 after an automatic stay was entered in the case due to Defendant FDF's bankruptcy petition. R. Doc. 75. The bankruptcy petition has been dismissed and the stay has been lifted. R. Doc. 76. Accordingly, the Court re-issues the following.

Before the Court are cross motions for summary judgment, one from Cantium and one from FDF. R. Docs. 60, 62. Both parties have filed oppositions to the other's motion. R. Docs. 66, 67. After a review of the briefing, record, applicable law, and oral argument, the Court now rules as follows.

**I.      BACKGROUND:**

This case arises out of a contractual dispute between Cantium and FDF. Cantium is a Louisiana oil and gas company that is engaged in the exploration, development, and sale of oil and natural gas in the Gulf of Mexico. R. Doc. 1 at 3. Cantium owns and operates offshore oil and gas platforms located in state waters of Louisiana and others affixed to the Outer Continental Shelf ("OCS") adjacent to Louisiana in the Gulf of Mexico. *Id.* FDF is a Louisiana company that provides drilling/completion fluids and rig and vessel cleaning services. *Id.* at 4. Cantium retained

1

FDF to provide rig and vessel cleaning services for its drilling operations and the parties entered into a Master Services Agreement ("FDF MSA"). *Id.*

Cantium was also under contract with Enterprise Offshore Drilling, LLC ("Enterprise"). Enterprise would provide various offshore drilling services to Cantium. *Id.* at 3-4. Enterprise is a Houston-based offshore drilling company that provides oil and gas drilling services in the Gulf of Mexico. *Id.* To perform those services, Enterprise utilizes a fleet of vessels that it owns and/or operates, including, but not limited to, the ENTERPRISE 205, a movable jack-up rig. *Id.*

William Jones, an employee of FDF, claims that he was injured by being struck by a crane stinger on or about April 25, 2021 while performing services for Cantium pursuant to the FDF MSA. *Id.* at 4-5. At the time of that incident, Jones and the crane which struck him were both aboard the ENTERPRISE 205, which was jacked-up on the OCS off the coast of Louisiana. *Id.* Jones filed suit in state court seeking damages for his injuries and asserting claims of negligence and unseaworthiness against Enterprise and seeking to hold Enterprise vicariously liable for the alleged negligence of its employees, Sean Keith and Curtis Thornton, leading to the accident. *Id.*

Enterprise tendered its defense and indemnity regarding the claims of William Jones to Cantium pursuant to the parties' defense and indemnity obligations set forth in the drilling services contract between those parties ("Enterprise MSA"). *Id.* at 5-6. Cantium in turn tendered Enterprise's defense and indemnity to FDF pursuant to the terms of the FDF MSA, which Cantium alleges obligates FDF to defend and indemnify Cantium and all members of Cantium's "Company Group," which includes Cantium's subcontractors such as Enterprise. *Id.*

FDF's insurer, The Hartford Fire Insurance Company ("The Hartford"), denied Cantium's tender to FDF to indemnify it against Jones's claims, taking the position that FDF's contractual

obligations to defend and indemnify Cantium and its contractors are void pursuant to the Louisiana Oilfield Indemnity Act ("LOIA"). *Id.* at 7-8.

Cantium then brought this action against FDF, seeking declaratory judgment that FDF must indemnify it/its contractor Enterprise against Jones's claims, as well as damages for breach of contract. *Id.* at 8-12. Cantium argues that the FDF MSA is governed by general maritime law, and thus the indemnity provisions are valid and it is entitled to contractual defense and indemnity. *Id.* Cantium also asserts that the FDF MSA required FDF to add Cantium as an additional named insured under its policy with The Hartford. *Id.* at 10-11. The breach of contract claim Cantium brings is premised on FDF allegedly breaching the additional named insured requirement under the FDF MSA. *Id.* at 11-12. FDF, on the other hand, asserts that the FDF MSA is governed by Louisiana law and generally denies Cantium's claim, and asserts several affirmative defenses, including comparative negligence, failure to mitigate damages, and that the contractual indemnity provisions are void pursuant to LOIA. R. Doc. 11 at 1-13. FDF also asserts a counterclaim against Cantium, seeking declaratory judgment that FDF is not obligated to defend or indemnify Cantium under the FDF MSA nor is it obligated to provide Cantium's attorney's fees and expenses related to Jones's claims. *Id.* at 14-19.

In January 2024, Cantium amended its complaint to add that it is seeking FDF's indemnification as to not only the claim against Enterprise but also the claims Jones brought against two Enterprise employees, Keith and Thornton. R. Doc. 43. FDF answered this amended complaint again generally denying the allegations and asserting several affirmative defenses. R. Doc. 53.

## II.    PRESENT MOTIONS

Cantium's motion for summary judgment urges the Court to find that the FDF MSA is a maritime contract and thus subject to general maritime law, not Louisiana state law. R. Doc. 60. Cantium argues that the jack-up rig where the injury occurred, the ENTERPRISE 205, is a vessel under Fifth Circuit jurisprudence and that this satisfies the *Doiron* test for determining whether a contract is a maritime contract. R. Doc. 60-1 at 2. Accordingly, it urges this Court to apply general maritime law and enforce the indemnity provision contained in the FDF MSA such that FDF must accept Cantium's tender and indemnify it in the underlying state court suit involving Jones and Enterprise. *Id.* at 10-22. Cantium additionally seeks reimbursement of attorney's fees and costs associated with its pursuit of indemnity under the FDF MSA. *Id.* at 22-23.

FDF's motion for summary judgment urges the Court to apply Louisiana law, not general maritime law. R. Doc. 62. FDF argues that, applying state law, the Louisiana Oilfield Anti-Indemnity Act ("LOIA") renders the indemnity provisions in the FDF MSA void and Cantium's claim against it for indemnity should thus be dismissed. R. Doc. 62-1 at 11-13. FDF makes several arguments against considering the FDF MSA a maritime contract: (1) that its expectation was that there would be no substantial vessel involvement in the completion of its contract with Cantium; (2) that FDF's work was not crucial to a vessel's navigation; and (3) that the jack-up rig, as temporarily affixed to the Outer Continental Shelf, does not constitute a vessel, and even if it does, that does not automatically make the contract a maritime contract. *Id.* at 13-21. FDF argues that it believed that the ENTERPRISE 205, while in the jacked-up position, was not a vessel when it entered into the FDF MSA with Cantium and therefore its expectations were that there would be no substantial vessel involvement while working on the ENTERPRISE 205. R. Doc. 62-1 at 5.

Both parties filed opposition briefs largely reasserting their arguments from their respective motions, though FDF raised a new issue in its opposition. See R. Docs. 66, 67. FDF argued that

Cantium does not have standing to recover fees and costs because its insurer, JH Blades, is the one incurring the expenses associated with the state court lawsuit between William Jones and Enterprise. R. Doc. 67 at 11. The Court allowed the parties to file supplemental briefing on the standing issue and the parties timely did so. R. Docs. 71, 72.

### III.    APPLICABLE LAW

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Initially, the movant bears the burden of presenting the basis for the motion; that is, the absence of a genuine issue as to any material fact or facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

#### A.  Louisiana Oilfield Anti-Indemnity Act

In Louisiana, state law renders certain indemnity provisions invalid in oil and gas contracts. The Louisiana Oilfield Anti-Indemnity Act provides:

> It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

La. R.S. § 9:2780(A). The statute applies to contracts, written or oral, that concern "operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals." *Id.* at § 9:2780(C). However, reciprocal indemnity provisions, sometimes called "knock-for-knock" provisions, are relatively common in maritime contracts. *See* 1 Admiralty & Mar. Law § 5:16 (6th ed.) (2023); William E. O'Neil, *Insuring Contractual Indemnity Agreements Under CGL, MGL, and P & I Policies*, 21 Tul. Mar. L.J. 359, 375-76 (1997). If the contract between Cantium and FDF is a maritime contract, these indemnity provisions are enforceable under general maritime law. But if the contract is non-maritime, these provisions are voidable under Louisiana law by LOIA. It is therefore necessary to determine which law applies to a given dispute when indemnity is at play, Louisiana law or the general maritime law. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-40 (5th Cir. 1986).

Courts recognize an exception to LOIA's nullification of indemnity provisions. Relying on *Marcel v. Placid Oil Co.*, courts applying Louisiana law will enforce indemnity agreements when "the principal pays for or obligates itself to pay for the cost of the indemnitor obtaining the insurance coverage*." Borman v. Shamrock Energy Solutions, LLC*, 421 F. Supp. 3d 382, 386 (E.D. La. 2019) (citing *Marcel v. Placid Oil Co.*, 11 F.3d 563, 569-70 (5th Cir. 1994)). This is referred to as a "*Marcel* premium" and some contracts contemplate such an arrangement. In the instant case, both the FDF MSA and Enterprise MSA contain provisions allowing for a *Marcel* premium, and FDF alleges that Enterprise paid Cantium's insurer a *Marcel* premium pursuant to the Enterprise MSA, however Cantium did not pay a *Marcel* premium to FDF's insurer, allegedly because it considered its contract a maritime contract. *See* R. Doc. 62-1 at 12.

### B.  Maritime Contracts and the Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") extends state law as a surrogate for federal law (1) when the controversy arises "on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto)," (2) when federal maritime law does not apply of its own force, and (3) when state law is not inconsistent with federal law. *Union Texas Petrol. Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990) (citing *Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 359 (1969)). The Fifth Circuit has found LOIA consistent with federal law in the context of this test. *See Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 789 (5th Cir. 2009) ("As to the third condition, as the district court noted, '[t]he Fifth Circuit has specifically held that 'nothing in the LOIA is inconsistent with federal law.' We agree with these conclusions."). The parties here dispute only the second prong, whether maritime law applies of its own force.

Maritime law applies to contractual indemnity provisions when the contract is a maritime contract. *In re Larry Doiron, Inc.*, 879 F.3d 568, 571 (5th Cir. 2018) (en banc). "If Louisiana law applies, the indemnity agreement is void as against public policy. If, on the other hand, the contract is maritime and state law does not apply, then the indemnity obligation is enforceable." *Id.* The Fifth Circuit set forth a two-prong test to determine whether a contract is maritime and thus subject to federal maritime law:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? . . . Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

*Id.* at 576 (rejecting an earlier six-factor test and instead adopting this streamlined two-part inquiry). As the Fifth Circuit explained, this "places the focus on the contract and the expectations of the parties." *Id.* When these focal points are unclear, courts may look to other factors, such as the work actually performed and the extent of the vessel's actual involvement. *Id.* at 577.

When determining whether a contract is maritime, courts examine "whether the principal objective of a contract is maritime commerce." *Id.* at 574 (quoting *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 25 (2004)); *see also Earnest v. Palfinger Marine USA, Inc.*, 90 F.4th 804, 809 (5th Cir. 2024) ("In doing so, we recognized *Kirby*'s emphasis that 'the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce.") (quoting *Kirby*, 543 U.S. at 25 and discussing the *Doiron* test). This requires a "conceptual, as opposed to spatial, approach," and lower courts must look beyond geography and instead to the substance of the contract. *Earnest*, 90 F.4th at 813; *Doiron*, 879 F.3d at 575 (discussing *Kirby*).

In *In re Larry Doiron*, the en banc court reversed the earlier panel's and district court's findings that the contract at issue was maritime, holding instead that the role of the vessel was insubstantial and therefore the contract was not a maritime contract. *Id.* at 577. In that case, Apache and Specialty Rental Tools & Supply entered into a master services contract where Specialty would provide services to Apache's gas well, which was accessible from Apache's platform. *Id.* Apache issued an "oral work order," as was customary pursuant to their contract, and Specialty sent crew members to perform the work. *See id.* Once the crew began the job, they encountered unexpected difficulties which required the use of a crane, so the parties contracted with Larry Doiron, Inc. to provide crane services by vessel. *Id.* at 570. The crane is what caused the injury that led to that litigation, and the suit centered around the applicability of the contract's indemnity provisions. *Id.*

The *Doiron* court noted that the contract consisted of the master services contract along with the oral work order, and that they "must be read together." *Id.* at 573. Applying its clarified two-part test to the facts in that case, the court found the parties did not expect a vessel to play a role in completing the contract because the vessel only became necessary upon the unexpected

problem the crew encountered. *Id.* at 577. Therefore, the vessel's and crane's functions were insubstantial and the contract was not a maritime contract. *Id.*

In a recent case, *Earnest v. Palfinger Marine USA*, the Fifth Circuit reversed the district court's finding and held that the contract was in fact a maritime contract. 90 F.4th at 813-14. That case involved a contract for servicing and maintaining lifeboats aboard a fixed platform in the Gulf of Mexico. *Id.* at 806-08. The district court had found that the lifeboats were not used in the course of Palfinger's inspections and therefore the use of vessels was not a substantial part of the contract. *Id.* at 812. Specifically, the district court looked to "where the work was conducted, *i.e.*, on the Auger Platform or on the lifeboats themselves," concluded that "the vessels were only incidental" to the contract, and that Palfinger did not "use" the lifeboats. *Id.* at 813.

In reversing, the Circuit explained that the district court improperly focused on the word "use" as opposed to considering "whether a vessel will play a substantial role in the completion of the contract." *Id.* at 813-14. Because the lifeboats were a regulatory requirement for the platform to operate, the court reasoned, they satisfied the first *Doiron* prong and enabled the platform to conduct its drilling operations. *Id.* at 812. Then, observing that maintenance and repair of vessels are "traditional maritime activities," the court easily concluded that the lifeboats (which are vessels) played a substantial role in the performance of the contract. *Id.* at 812-13 ("[T]he 'nature and character' of the contract is for the repair and maintenance of vessels necessary to support offshore drilling and production of oil and gas, *i.e.*, maritime commerce.").

Courts applying the *Doiron* test must occasionally grapple with whether a vessel is even involved. This is particularly true in cases involving jack-up drilling rigs, which are floating rigs used for drilling or exploration and which can temporarily affix themselves to the seabed. The jack-up rig at issue in this case, the ENTERPRISE 205, is described by the parties as follows:

> The ENTERPRISE 205 floats and is towed to its location by other vessels. Upon arrival at its drilling location, the ENTERPRISE 205 lowers its mat to the sea floor using the three legs in the corners of the triangular barge. Once the mat contacts the sea floor, the barge is raised above the water using the three elevating legs until the vessel has reached its operational height. The rig's drilling package is then cantilevered out horizontally from the barge over the water, where it then can raise and lowe drill pipe into the seafloor. Once operations are complete, the ENTERPRISE 205 is lowered back into the water where it floats to its next work location.

Cantium's Memorandum, R. Doc. 60-1 at 4.

> The Enterprise 205 is a jack-up rig which is not self-propelled and must be jacked down into the water and towed with tow boats to move to a new location. To affix the Enterprise 205 to the seabed floor, a mat and poles are jacked down to the seabed floor, then the platform and the drilling package is jacked up out of the water. The drilling package is then cantilevered out over and attached to the platform that is provided by the owner/operator of the well (in this case, Cantium).

FDF's Memorandum, R. Doc. 62-1 at 5.

The Fifth Circuit has established "beyond dispute" that "special-purpose movable drilling rigs, including jack-up rigs, are vessels within the meaning of admiralty law." *Demette v. Falcon Drilling Co., Inc.*, 280 F.3d 492, 498 n.18 (5th Cir. 2002), *abrogated on other grounds by Grand Isle Shipyard*, 589 F.3d at 787; *see also Offshore Co. v. Robison*, 266 F.2d 769, 776 (5th Cir. 1959) ("In other words, under the Jones Act a vessel may mean something more than a means of transport on water."). The Circuit has also rejected a reclassification of a vessel based upon whether or not it is actively navigating on water. *American Eastern Development Corp. v. Everglades Marina, Inc.*, 608 F.2d 123, 124-25 (5th Cir. 1979) (discussing dry storage and wharfing); *Delome v. Union Barge Line Co.*, 444 F.2d 225, 228 (5th Cir. 1971) (discussing a ship undergoing repairs); *see also Demette*, 280 F.3d at 498 n.18 ("Further, the dissent's definition of vessel, which requires that the object 'float on water,' would also exclude submersible rigs and submarines (when submerged), and boats employing hydrofoils (which displace less water than their mass).").

## C. *Corbitt*'s Applicability

Even if the Court finds that the FDF MSA is a maritime contract and that LOIA is inapplicable, FDF suggests that *Corbitt v. Diamond M. Drilling Co.* demonstrates that the indemnity provision at issue here does not cover Cantium's contractual liability stemming from the Enterprise MSA's indemnification provision. *See* 654 F.2d 329 (5th Cir. 1981).

In *Corbitt*, the Fifth Circuit held that an indemnity provision did not cover the indemnitee's contractual liability under a separate contract. In that case, Shell contracted with Diamond M. Co. to obtain drilling services and materials and in a separate contract, Shell contracted with Sladco to obtain casings services. *Id.* at 330-31. Both contracts contained indemnification provisions: Shell agreed to indemnify Diamond M. under their contract, and Sladco agreed to indemnify Shell under their contract. *Id.* Corbitt was an employee of Sladco who was injured while aboard the rig owned by Diamond M. in connection with each entities' contracts with Shell. *Id.* Corbitt sued Diamond M. for negligence, and Diamond M. tendered Shell who accepted pursuant to its agreement to indemnify Diamond M. *Id.* Shell then sought indemnification from Sladco pursuant to their contract and Sladco refused. In this posture, Shell is analogous to Cantium, Diamond M. is analogous to Enterprise, and Sladco is analogous to FDF.

The district court found that the indemnity provision in the Shell-Sladco contract did not require Sladco to indemnify Shell for Shell's contractual liabilities (such as Shell's agreement to indemnity Diamond M. in that separate contract) because parties agreeing to such far reaching coverage would need to expressly state as much in the provision. *Id.* at 333. The Fifth Circuit affirmed this interpretation of the indemnity provision, reasoning that "an indemnitor is entitled to express notice that under his agreement, and through no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee. For the same reasons express notice is required where a party seeks to shift his contractual liability to indemnify a third party."

*Id.* In so holding, the court relied heavily on the indemnity provision's language itself, which it found too narrow to have contemplated "such an unusual and surprising obligation." *Id.*

Cases since *Corbitt* however have confined its holding to its facts and have distinguished various indemnity provisions from the provision at issue there. For example, in *Sumrall v. Ensco Offshore Co.*, the Fifth Circuit found a duty to indemnify existed because the indemnity provision was "broader than was the scope of employer Sladco's duty to indemnify Shell Oil in *Corbitt*." 291 F.3d 316, 320 (5th Cir. 2002). Specifically, the Circuit emphasized that the provision in *Sumrall* required indemnity not only of the company Santa Fe, but also Santa Fe's contractors and subcontractors, thereby vitiating the applicability of *Corbitt*. *Id.* Similarly, in *Campbell v. Sonat Offshore Drilling, Inc.*, the Fifth Circuit rejected *Corbitt*'s applicability because the indemnity provision at issue there contemplated indemnity for both the company *and* its contractors. 27 F.3d 185, 187-88 (5th Cir. 1994). This was also the case in *Lirette v. Popich Bros. Water Transport, Inc.*, where the Fifth Circuit explained that an indemnity provision which contemplates indemnifying not only one company but also its contractors is not inconsistent with the holding in *Corbitt*. 699 F.2d 725, 728 (5th Cir. 1983). There, the court explained:

> In Candies' claim over, Popich was not, as in *Corbitt*, being subjected to a liability arising from and imposed by a completely separate contract between two outsiders. Rather, it was called upon to make good its contractual obligation to hold Candies (and Exxon) harmless from claims, suits or damages "arising out of, or in any way connected [with] the operation of the vessel under this charter."

*Id.* Accordingly, the specific language of the indemnity provision bears significance.

While *Corbitt* contains a similar fact pattern to the situation here, the language in the FDF MSA indemnity provision between Cantium and FDF is broader than the *Corbitt* language. The provision here states:

> Contractor shall defend, protect, indemnify and hold harmless *Company Group* from and against any and all claims brought by any person, party or entity for

> personal or bodily injury to, sickness, disease or death of any member of Contractor Group, and for damage to or loss or destruction of property owned, leased, rented or hired by any member of Contractor Group, arising out of or in connection with the performance or non-performance of the services under this agreement or any service order.

R. Doc. 62-5 at 19, § 29.1 (emphasis added). Company Group is defined to include "Company [Cantium], Company's Affiliates, Joint Interest Owners, and their Affiliates, and their contractors and subcontractors (excluding any Person of Contractor Group), and the directors, officers, employees, agents and invitees of all of them." *Id.* at 3, §1.1(J).[1] In this case, FDF expressly agreed to indemnify Cantium's contractors such as Enterprise in exactly this circumstance, and the narrower indemnity agreement in *Corbitt* simply does not apply.

### D.  Attorney's Fees & Standing

Courts typically read indemnity provisions to include the cost of attorney's fees relating to the underlying suit's defense. *Lirette*, 699 F.2d 728 ("The duty to indemnify and hold harmless includes the payment of costs and attorney's fees."); *id.* at 728 n.11 ("The duty to indemnify by paying attorney's fees incurred in defending an action has been found in clauses using broad language calling for indemnification and hold harmless without the inclusion of the magical language 'defend.'"). The Fifth Circuit has frequently found that when indemnity provisions apply, they include costs and attorney's fees. *Olsen v. Shell Oil Co.*, 595 F.2d 1099, 1103 (5th Cir. 1979) ("A contract to indemnify and hold harmless, if applicable, includes payment of costs and attorney's fees incurred by the indemnitee []."); *Lirette*, 699 F.2d at 728; *Signal Oil & Gas Co. v. Barge W-701*, 654 F.2d 1164, 1177-78 (5th Cir. 1981) (noting that "this court and others have

---

[1] The Court reads the parenthetical to modify the term "subcontractors" because to define Company Group as including contractors and then in the next breath exclude them would render the definition meaningless. The Court reads the various provisions of this contract, including these various definitions, such that together they are not inconsistent.

found attorneys' fees properly recoverable in reliance on language in indemnity agreements no more specific than that present here").

In *Signal Oil & Gas Co. v. Barge W-701*, the contract's language required indemnification for "any and all loss, cost, damage, expense, claims, actions and liability of account of any and all damage to and loss of or destruction of any property belonging to" the indemnitee. 654 F.2d at 1177. The circuit found this provision was worded such that attorney's fees for the underlying suit were covered, even though the district court thought the enumerated list ("loss, cost, damage, expense, claims, actions and liability") did not specifically list attorney's fees. *Id.* However, the circuit reasoned that fees associated with establishing the right to indemnity were not recoverable because it "decline[d] to hold it within the contemplation of the contracting parties that the indemnitor would have to be taken to court to insure satisfaction of his agreed upon payment." *Id.* at 1178-79 (collecting cases).

## IV.    DISCUSSION

The Court will first address the question of whether the FDF MSA is a maritime contract and whether the indemnity provisions are valid and enforceable. Then, the Court will turn to the issue of standing and entitlement to attorney's fees.[2] Lastly, the Court will address the breach of contract claim.

To recap, the *Doiron* test is as follows:

First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? . . . Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

---

[2] The issue of the *amount* of attorney's fees has been bifurcated. *Entitlement* to attorney's fees will be determined here.

*Doiron*, 879 F.3d at 576. There are two threshold questions that impact the *Doiron* analysis: (1) which contract must the Court analyze under this test, and (2) whether the ENTERPRISE 205 is a vessel. FDF's arguments all relate to its (incorrect) understanding that the jack-up rig was not a vessel when it was jacked up because it was not "in navigation." FDF therefore claims that it never "expected" a vessel would play a substantial role in its services because the jack-up right was not a vessel.

To begin, the parties disagree as to *which* contract applies – the FDF MSA, the Work Order, or a combination of the two. *See* R. Doc. 62-1 at 10-12 (discussing the relevance of the Work Order). FDF urges the Court to look to the Work Order because it highlights FDF's understanding that it would be performing non-maritime work, that is, "by cleaning the tanks [located on the ENTERPRISE 205] used for drilling purposes," and that FDF did not expect a vessel to play a substantial role in this task. *Id.* at 10-12. In the present case, the purpose of the Work Order was the cleaning of the ENTERPRISE 205 tanks. The ENTERPRISE 205 is a vessel. Thus, the objective of the Work Order was the cleaning of a vessel's tanks. This is clearly a maritime contract just as it was in *Earnest*. The fact that FDF incorrectly or mistakenly concluded that the ENTERPRISE 205, while jacked-up, ceased to be a vessel cannot affect the vessel status of the ENTERPRISE 205. In fact, in the present case the injured employee alleging he was a member of the crew of the ENTERPRISE 205 filed a Jones Act claim alleging negligence and that this vessel, the ENTERPRISE 205, was unseaworthy. Thus, a vessel played a substantial role in the performance of the contract. This is true whether the contract at issue is the FDF MSA or the Work Order or both since the Work Order specifically addressed tank cleaning on the ENTERPRISE 205. In this case, the Court finds that the contract is the FDF MSA and that the Work Order may

be looked at in conjunction, but the Work Order itself is not a standalone contract.[3] In any event, a vessel (the ENTERPRISE 205) plays a substantial role in the completion of the contract, as will be explained.

As mentioned above, the Court concludes that the FDF MSA is a maritime contract. A *Doiron* analysis supports this conclusion. The first *Doiron* prong is clearly satisfied: the contract is one that facilitates drilling services on navigable waters, as without the tanks cleaned, the drilling operations are not possible. The tasks William Jones was assigned to perform were "to clean the tanks on the rig as the drilling operation was going from an oil-based mud into drill-in fluid as the next step in the drilling process" and to "clean the shakers which would take in the mud mixed with cuttings from where the wells were being drilled, and separate the cuttings from the mud so the mud could pass again through the drilling bit for lubrication purposes." R. Doc. 62-1 at 10. This easily satisfies *Doiron*'s first prong, and the parties do not argue this point.

The second *Doiron* prong asks whether the contract provides or whether the parties expect a vessel to play a substantial role in the performance of the contract. There is no dispute that both parties expected the ENTERPRISE 205 to play a substantial role in the contract, as the FDF MSA's objective was "rig and vessel cleaning services and drilling fluids" and William Jones's task on the date of injury was to clean the tanks on the ENTERPRISE 205. The crux of FDF's argument, however, is that *Doiron*'s second prong fails because it *expected* that the ENTERPRISE 205 ceased to be a vessel once it became jacked-up.

---

[3] At oral argument on these motions, the parties explored this question and the Court took note that the Work Order itself expressly states that the FDF MSA governs it and that the FDF MSA controls should any conflicts and between it and the Work Order arise. Work Order, R. Doc. 60-3 at 1 ("This Master Service/Purchase Order is …  governed by the Master Service Agreement ["Contract"] … The terms and conditions of the Contract are hereby incorporated by reference into this Master Service/Purchase Order. … The Contract shall prevail in the event of any conflict between the terms of the Contract and the terms of this Master Service/Purchase Order.").

This presents a unique twist on *Doiron* because, in essence, the Court is asked to find that a party's incorrect belief about what the law is transforms the contract. The Fifth Circuit's established jurisprudence in this field has long found jack-up rigs to be vessels, regardless of whether they are actively moving or not. The question here is whether a party's belief or expectation that is contrary to established law ought negate the existence of a maritime contract. The Court concludes that it should not.

Further, although it could have done so, FDF did not have an attorney review the contract or engage in negotiations as to various terms. Alex Dore, FDF's corporate representative, testified by deposition on this subject as follows:

> Q: And were you able to find any [communications regarding the contract negotiations]?
> A: I was able to find some concerning, hey, here's the copy of the contract, can you sign it, it's in the back. That was - -
> A: Okay.
> A: -- the extent of that conversation.
> Q: I got it. So, in other words, it - - there was not like redlining of the contract going back and forth in drafts or anything like that?
> A: Typically, if we do reline something, it's payment terms only. So I mean - -
> Q: I got it. Did you-all use an outside - - and when I say "you-all," I mean obviously FDF.
> A: Yes.
> Q: Did FDF use an outside or an in-house attorney in the contracting process with Cantium?
> A: We did not.

*Id.* at 14:6-14:23. In this context especially, FDF's expectations that this jack-up rig was not a vessel in its jacked-up position should not be given sufficient weight such that the second *Doiron* prong fails.

The Court observes that, while not argued, the second Doiron prong reads "does the contract provide *or* do the parties expect that a vessel will play a substantial role in the completion of the contract?" Because the contract provides that a vessel, the ENTERPRISE 205, will play a

substantial role in the completion of the contract, the Court could find the contract satisfies *Doiron* without examining the parties' expectations at all. However, the Court finds the expectations of the parties was that the ENTERPRISE 205 would play a substantial role and therefore the contract satisfies *Doiron*, as explained above.

The contract here is a maritime contract. Accordingly, LOIA is inapplicable and the indemnity provisions are valid and enforceable. This is true even though FDF argues that *Corbitt* forecloses their enforcement.

As the Court finds this a maritime contract and that the indemnity provisions are valid and enforceable, the question of entitlement to attorney's fees follows naturally. Courts have held that indemnity provisions requiring a party to indemnify and hold harmless, even absent the word "defend," necessarily includes attorney's fees and costs. Accordingly, because the Court finds FDF must indemnify Cantium and Enterprise, as members of the Company Group under the FDF MSA, in the suit brought by William Jones, the Court must find that Cantium is entitled to all fees, costs, and expenses incurred in that defense.

Cantium is also entitled to the fees incurred in *this* litigation (Cantium's attempt to enforce its indemnification rights). While some courts have held that it would be beyond the parties' contemplation to have to bring the other to court to enforce its indemnity rights, that is not so here. In this FDF MSA, costs related to enforcement of indemnity rights is expressly contemplated and the Court has no trouble concluding that Cantium is entitled to these costs as well. Section 29.5 of the FDF MSA states in relevant part

> Contractor shall defend, protect, indemnify and hold harmless the company group against all liens, claims and demands (*including without limitation expenses, costs or attorney's fees incurred for any company group's defense or for enforcement of its indemnification rights*) arising out of or in connection with the performance or non-performance of services or materials supplied by contract under this agreement….

18

*Id.* at 20, § 29.5 (emphasis added). In this instance, because the parties contracted to provide for such indemnification, the Court finds Cantium entitled to the attorney's fees and costs associated with its suit to enforce its indemnification rights as well as the underlying suit.

FDF however argues that this subsection addresses only claims (and liens and demands) relating to FDF's "performance or non-performance of *services or materials*," not claims arising out of bodily injury, and therefore this language is irrelevant to the case at hand. See R. Doc. 72 at 10-11. Since this language is not in § 29.1, the subsection dealing with bodily injury claims, FDF urges the Court to limit this language's reading to only claims involving services or materials. The Court understands FDF's position but cannot escape that this language is still included within the broader indemnity section of the FDF MSA, Section 29. The Court therefore finds that enforcement of indemnity rights was contemplated by the parties as a recoverable expense under the contract.

Additionally, FDF has argued that, even if the FDF MSA provides for attorney's fees and costs in some contexts, that in this case Cantium has not proven its entitlement to these expenses because its insurer, JH Blades, is the entity paying for the defense in the William Jones suit.[4] FDF has stretched this argument further by arguing that Cantium does not have a right to pursue indemnity either because of this alleged lack of standing. FDF asserts that it should be JH Blades bringing this suit for recovery, not Cantium. In response, Cantium notes that the FDF MSA expressly permits Cantium to recover these costs, pointing to the various provisions already discussed, and that the contract's language says nothing about an insurer being the required or

---

[4] Cantium obtained an insurance policy with JH Blades pursuant to its Enterprise MSA. R. Doc. 71 at 6 ("The fact that Cantium independently procured a policy of insurance to cover its potential liability under its MODSA [Enterprise MSA] with Enterprise – a completely separate contract, between different parties, and relating to different services – is irrelevant to the enforcement of the clear terms of the [FDF] MSA.").

proper party to pursue indemnification and/or reimbursement of fees and costs. Cantium argues that the collateral source rule would also work against FDF's position and, further, that JH Blades is entitled to subrogation under the policy. *See* R. Doc. 71 at 7 (citing relevant portions of the insurance policy and noting that the policy requires the insured, Cantium, to either assign JH Blades the right to pursue loss under the policy or to pursue that loss itself by bringing its own suit).

Cantium alleges that to accept FDF's contention that only JH Blades has standing in this case yields absurd consequences. As Cantium describes,

> FDF's arguments are akin to taking the position that an injured plaintiff does not have standing to recover the cost of any outstanding incident-related medical bills as only the provider itself would have "actually incurred" such expenses. However, no defendant can seriously argue that a plaintiff lacks standing to recover medical expenses paid by his or her insurer.

*Id.* at 6-7. Although FDF cites to *Duval v. Northern Assurance Co. of America* for support, this case expressly states that an insurer bringing a third-party complaint for recovery of fees and indemnification is *not* the proper party to do so, the contract's signatory is. 722 F.3d 300, 303-04 (5th Cir. 2013). In *Duval*, BHP and Deep Marine entered into an MSA with reciprocal indemnity provisions, and when an employee of another BHP contractor was injured, he sued Deep Marine who then tendered BHP and BHP accepted. *Id.* at 302-03. Deep Marine however then declared bankruptcy and, as a result, the bankruptcy court ordered the injured employee, Duval, to only proceed against Deep Marine's insurer, not Deep Marine itself. *Id.* That insurer then brought a third-party complaint against BHP, "seeking to be 'fully protected, defended, indemnified, held harmless and provided insurance coverage' by BHP in accordance with the MSA." *Id.* The Fifth Circuit affirmed the district court and found that BHP had no indemnity obligation to the insurer

for Duval's claim. BHP's only obligation to indemnify under the MSA ran to Deep Marine. *Id.* at 303-05.

FDF points to *Duval* to show that JH Blades has no right to recover fees from FDF that were incurred in the William Jones suit. But this suit was not brought by JH Blades; Cantium is the Plaintiff. Cantium has the right to recover fees incurred in the William Jones suit. As mentioned earlier, the question of the *amount* of fees has been bifurcated. On the question of *entitlement* to these fees, however, the Court finds that Cantium has this right under the FDF MSA's clear language. Whether they have incurred any expenses or paid any attorney's fees and if so the amount thereof will be determined in the bifurcated action.

The Court turns now to the breach of contract claim. Cantium asserted this claim in relation to FDF's failure to list Cantium as an additional insured and/or obtain the requisite coverage under the FDF MSA in favor of Cantium. R. Doc. 1 at 11-13. At oral argument, FDF argued that this claim must fail because of *Corbitt*. But, as the Court has already discussed, *Corbitt* is inapplicable to the instant case. FDF also argued that the FDF MSA did not expressly require them to name Cantium as an additional insured, and only mentioned this requirement in a parenthetical in one paragraph of the insurance section, § 18(K). However, the Court finds § 18(K) clear and unambiguous. It states in relevant part that "Contractor shall release, protect, defend, indemnify, and hold harmless the Company Group from any loss Company Group may suffer due to Contractor's failure to comply with all of the above insurance requirements (including obtaining waivers of subrogation, adding Company Group as additional insured, and being primary)." There is no qualifying language or ambiguity in this provision. The Court finds § 18(K) required FDF to add the Company Group, which includes Cantium and Enterprise, as additional insureds and to the

extent that it has not complied with this requirement, § 18(L) requires it to perform its obligations as self-insured. R. Doc. 62-5 at 15.

Accordingly, for the foregoing reasons, FDF's Motion for Summary Judgment, R. Doc. 62, is **DENIED** and Cantium's Motion for Summary Judgment, R. Doc. 60 is **GRANTED**. As mentioned earlier, the Court bifurcated the question of the amount of attorney's fees. Upon motion, the Court will entertain briefing and/or a hearing on this question.

New Orleans, Louisiana, this 7th day of June, 2024.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE